IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

**DORIS E. WHITE,**
      **Plaintiff,**

**v.**                               **No:  1:05cv53/MP/MD**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**
      **Defendant.**
_____

### REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant White's application for disability insurance benefits and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Act.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

### PROCEDURAL HISTORY

      Plaintiff filed applications for disability insurance benefits and SSI benefits which were denied initially and on reconsideration.  She requested a hearing before

an Administrative Law Judge (ALJ) and a hearing was held on March 28, 2003 at which plaintiff was represented by counsel and testified.  A vocational expert also testified.  The ALJ rendered an unfavorable decision on August 4, 2003 (Tr. 18-33) and the Appeals Council declined review (Tr. 6-10), making the decision of the ALJ the final decision of the Commissioner, and therefore subject to review in this court.  *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that plaintiff had severe limitations caused by depression, obesity, diabetes mellitus, hypertension, aortic valve disease, status post valve replacement, GERD, and right shoulder tendinitis, but that she did not have an impairment or combination of impairments that would meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; that plaintiff's allegations regarding her limitations were not fully credible, that plaintiff had the residual capacity to perform work at the sedentary level; that her past relevant work as a records clerk did not require performance of work precluded by working at the sedentary level; and that she was not under a disability as defined in the Act.

## STANDARD OF REVIEW

The ALJ's decision will be reversed only if it is not supported by substantial evidence.  *Falge, supra*.  The court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether it is premised upon correct legal principles.  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).  In determining whether substantial

evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted). Findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  42 U.S.C. § 405(g); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps.  A finding of disability or no disability at any step renders further evaluation unnecessary.  The steps are:

`

1.   Is the individual currently engaged in substantial gainful activity?

2.   Does the individual have any severe impairment?

3.   Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.   Does the individual have any impairments which prevent past relevant work?

5.   Do the individual's impairments prevent any other work?

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  *Chester v. Bowen*, supra, 792 F.2d at 131; *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, claimant must prove that she cannot perform the work suggested by the Commissioner.  *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY[1]

In her August 2000 applications plaintiff alleged disability since August 16, 2000, based on diabetes, gastroesophageal reflux disease (GERD), aortic-valve replacement surgery, chest pains, shortness of breath, rotator-cuff tear, constant right-knee and leg pain, arthritis, degenerative joint disease, and right-eye blindness (Tr. 69, 85, 452).  Plaintiff is a high school graduate, with forensic training and two years of college (Tr. 91, 579-80).  At the time of the March 2003 hearing, plaintiff was 50 years of age, 5'4" tall, and weighed 260 pounds (Tr. 579).  From 1981 to 1996, plaintiff worked as a forensic investigator (Tr. 94).  From June 1997 to August 2000, she worked for the State of Florida (Tacachale) as a short-haul truck driver, a manager in a workshop for developmentally disabled individuals, and a cashier and food server (Tr. 94, 96, 111, 581, 592-93).  As a truck driver, she lifted 70 pounds and walked four hours daily (Tr. 581-82).  Her job in the workshop involved mostly paperwork and overseeing time sheets, but she also at times would help the workers with their projects (Tr. 581-82).  She sat most of the day in the workshop, and she

---

[1] The following medical history is copied, in abbreviated form, from the Commissioner's memorandum. The court has reviewed the plaintiff's medical file in detail, and finds that the Commissioner's summary is a very fair and complete summary.  Plaintiff, after being granted two extensions and then filing her memorandum late, did not favor the court with anything concerning plaintiff's medical histories other than to point to certain entries favorable to her claim.

lifted only five pounds (Tr. 583).  Plaintiff alleges that she was "dismissed" on August 16, 2000, because of her medical condition (Tr. 85, 579).

Records predating her alleged onset date show that, on October 12, 1997, plaintiff injured her right shoulder (Tr. 161).  On May 8, 1998, plaintiff underwent arthroscopic rotator-cuff surgery (Tr. 155-57).  After ten months of physical therapy and home exercises, orthopaedist Timothy Lane, M.D., opined that plaintiff had reached maximum medical improvement (Tr. 151-54).  By letter dated March 29, 1999, Dr. Lane opined that plaintiff had a permanent loss of mobility in her right shoulder; that plaintiff could lift only ten pounds with her right arm; and that plaintiff could not reach or lift above chest level with her right arm (Tr. 150).  He further opined that plaintiff could return to only light-duty work (Tr. 150).

During March 1999 and April 1999, plaintiff reported to the Shands emergency room three times with complaints of dyspnea on exertion, nasal congestion, hypertension, and pressure and burning sensations in her chest (Tr. 117-19).  The treating physician assessed GERD and noncardiac chest pain (Tr. 117-18).  In May 1999 and August 1999, plaintiff returned to Dr. Lane with recurrent shoulder pain (Tr. 149). Dr. Lane diagnosed a tendinitis flare, and he prescribed Tylenol No. 3 and exercise therapy (Tr. 149).  On September 29, 1999, plaintiff returned to Dr. Lane, complaining of increased pain in her right shoulder (Tr. 148-49). Dr. Lane prescribed Darvocet, and he advised plaintiff to remain working at light duty (Tr. 148).

On October 1, 1999, plaintiff saw gastroenterologist Juan G. Herrera, M.D. (Tr. 137-38).  Her GERD was well controlled with Prilosec and she was not in acute distress (Tr. 137).  An upper GI x-ray revealed filing defects in the lower esophagus, and an upper endoscopy revealed a small hiatal hernia and small anterior nodules (Tr. 135-37).  Dr. Herrera continued plaintiff on Prilosec (Tr. 137).

On October 18, 1999, plaintiff saw Charles Wilson, M.D., with complaints of acute chest pain that awoke her at night (Tr. 112).  She advised that the pain, which

she rated at nine out of ten, radiated to the left part of her neck and left arm; and that she had undergone an atrial-valve replacement in 1998 (Tr. 112).  A physical examination, as well as an echocardiogram, revealed no abnormalities (Tr. 113, 115).  Dr. Wilson diagnosed chest pain status post atrial-valve replacement, diabetes mellitus, and hypertension (Tr. 113).

On November 3, 1999, plaintiff returned to Dr. Lane with shoulder discomfort (Tr. 148).   Darvocet helped her pain, but she had a limited range of motion in her right arm, and her strength had decreased (Tr. 148).  An MRI scan revealed high intensity signals in the distal supra- and infraspinatus tendons secondary to a tendinopathy (Tr. 148). On November 10, 1999, plaintiff returned to Dr. Herrera with breakthrough pyrosis, but in December 1999, plaintiff reported "doing well" on Prilosec and Reglan (Tr. 130, 135).

On January 21, 2000, plaintiff reported to James J. Omeara, M.D., with shortness of breath, nausea, intermittent diaphoresis, and upper-chest pain (Tr. 277).  An electrocardiogram revealed normal sinus rhythm with left ventricular hypertrophy (Tr. 278).  Dr. Omeara diagnosed gastrointestinal chest pain, status post mechanical aortic-valve replacement with inadequate anticoagulation, poorly controlled diabetes, GERD, and obesity (Tr. 278).

On February 22, 2000, plaintiff returned to Dr. Herrera for treatment of her GERD, diabetes, and hypertension (Tr. 129).  Dr. Herrera continued plaintiff on Prilosec and Reglan, and he advised her to limit her sugar intake (Tr. 129).  In May 2000, plaintiff returned to the Shands emergency room, with profound dyspnea and sudden chest pain, which she rated at ten out of ten (Tr. 120-26).   An electrocardiogram revealed a normal sinus rhythm (Tr. 125).   Plaintiff was diagnosed with noncardiac chest pain, diabetes mellitus, hypertension, post aortic-valve replacement secondary to endocarditis, urinary-tract infection, hiatal hernia,

GERD, diabetic gastroparesis, dysfunction uterine bleeding, and hypercholesterolemia (Tr. 120).

In June 2000, plaintiff saw Dr. Herrera for continued treatment of her GERD, gastroparesis, diabetes, and noncardiac chest pain (Tr. 128). Dr. Herrera continued plaintiff with Prilosec and Reglan, and he prescribed Nitroglycerin for her esophageal spasms (Tr. 128). In July 2000, plaintiff returned to Dr. Lane for treatment of her shoulder injury (Tr. 146, 148). Dr. Lane noted that plaintiff was "status quo," and he prescribed Darvocet and continued plaintiff with her home exercise program (Tr. 146).

On July 18, 2000, plaintiff reported to the Shands emergency room, complaining of throbbing pain in her legs and dyspnea upon exertion (Tr. 140-45). An echocardiogram revealed no evidence of pulmonary hypertension or systolic dysfunction of valve failure (Tr. 140, 273- 74). Plaintiff was discharged with insulin, Reglan, Estradiol, Lasix, Avandia, Zestril, Prilosec, Coumadin, Toprol XL, Medroxyprogesterone, Tylenol, and an Albuterol inhaler (Tr. 141).

On August 17, 2000, one day after her claimed onset of disability, plaintiff returned to Dr. Lane (Tr. 146). She reported that she had been working in the kitchen at Tacachale, and that serving food had caused increased pain and tingling sensations in her shoulder and arm (Tr. 146). She advised that her right shoulder was "much less irritated" by her previous job, which involved mostly paperwork (Tr. 146). Dr. Lane diagnosed increased tendinitis symptoms, and he advised plaintiff to return to a "paper work type job" (Tr. 146). On September 5, 2000, plaintiff returned to Dr. Lane, complaining of right-knee pain (Tr. 146). She advised that she had been dismissed from her job at Tacachale "because of her limitations associated with her multiple medical problems" (Tr. 146-47). X-rays of her right knee were unremarkable, but Dr. Lane suspected a meniscal tear (Tr. 147). On January

29, 2001, plaintiff reported to the Alachua County Clinic with severe low-back pain (Tr. 359).  Tylenol No. 3 was prescribed (Tr. 359).

A February 8, 2001 upper endoscopy revealed the presence of a polyp structure at the gastroesophageal junction, and diffuse gastric erythema throughout the stomach corpus (Tr. 206).  Dr. Herrera prescribed continued PPI therapy and GERD lifestyle modifications (Tr. 206).  A February 22, 2001 echocardiogram revealed mild aortic insufficiency and mild mitral insufficiency (Tr. 217-18, 220).  A February 23, 2001 transesophageal echocardiography revealed normal left ventricular contractility without wall motion abnormality, mild concentric left ventricular hypertrophy, a mild paravalvular leak of aortic insufficiency, a questionable fistulous track into the right ventricle, mild mitral insufficiency, and mild tricuspid insufficiency (Tr. 269-70).  On April 10, 2001, plaintiff advised that her GERD symptoms were controlled with medications (Tr. 355).  She also admitted to noncompliance with physician recommendations for dieting and exercise (Tr. 355).  A May 10, 2001 diabetic foot evaluation revealed no significant concerns (Tr. 347-51).

On May 14, 2001, plaintiff reported to cardiologist Michael C. Dillon, M.D., complaining of atypical chest pain (Tr. 220).  After reviewing February 2001 diagnostic studies and an earlier cardiac catheterization, he opined that plaintiff's chest pain was not cardiac related (Tr. 220).

On May 18, 2001, plaintiff reported to Robert A. Greenberg, M.D., for a consultative examination (Tr. 221-23).  Plaintiff advised Dr. Greenberg that she had both dull and sharp pains in her chest roughly three times weekly, and that her chest pains were "brought on by almost any type of exertion such as climbing stairs, doing housework or heavy lifting" (Tr. 221).  She reported that Nitroglycerin provided her variable relief, and that she was currently being treated with Toprol XL, Coumadin, and Lasix (Tr. 221).  She also reported right-shoulder and low-back pain, as well as diabetes-related chronic fatigue and periodic numbness or burning in her

feet (Tr. 221).  Plaintiff was not taking any specific medication for her shoulder and back pain, and she had GERD symptoms despite her use of Reglan and Prilosec (Tr. 221).  Upon examination, Dr. Greenberg noted plaintiff had a grade II/VI systolic murmur and diastolic murmur on the left side of the precordium, but he found no evidence of a cardiac enlargement by percussion (Tr. 222).  Examination of the extremities revealed no clubbing, cyanosis, or edema (Tr. 222).  Plaintiff had decreased range of motion in her right shoulder and lumbar spine, but full range of motion in all other joints (Tr. 222).  There was no evidence of active inflammatory arthritis, and plaintiff's grip strength and fine manipulation were normal (Tr. 222).  Dr. Greenberg noted that plaintiff demonstrated no complications due to her hypertension, and that no clinical signs of significant respiratory impairment were present (Tr. 222).  He diagnosed a history of endocarditis; probable aortic and mitral valve insufficiency; chest pains with both typical and atypical features for angina; insulin-dependent diabetes with symptoms suggesting early peripheral neuropathy; probable osteoarthritis of the right shoulder and lumbar spine; and symptomatic GERD (Tr. 223).  Based on these diagnoses, Dr. Greenberg concluded that plaintiff "would be unable to perform work related activities that require[d] heavy exertion, heavy lifting or bending" (Tr. 223).

On July 11, 2001, plaintiff saw gastroenterologist Charles A. Sninsky, M.D., who noted that plaintiff was morbidly obese and had gained 75 pounds since her initial presentation in October 1999 (Tr. 245).  Dr. Sninsky opined that plaintiff's obesity contributed to her GERD, and he noted that plaintiff had been counseled extensively on weight loss (Tr. 245).  He further noted that plaintiff was a poor candidate for anti-reflux surgery, that her reflux esophagitis was determined to be only mild during her last endoscopy, and that a repeat endoscopy was not warranted at that time (Tr. 245).

On August 6, 2001, plaintiff returned to Dr. Dillon (Tr. 237). She had not lost any weight, and she continued to have some nonsevere but atypical chest pain (Tr. 237). A cardiac examination was normal (Tr. 237). Dr. Dillon was "not strongly suspicious of endocarditis," and opined that plaintiff would strongly benefit from weight-loss intervention (Tr. 237). Based on an August 15, 2001 transesophageal echocardiography, Dr. Dillon opined that plaintiff's chest pain was not related to her cardiac status, that plaintiff's aortic valve prosthesis was functionally normal, and that plaintiff's chest pains were likely due to obesity and elevated blood sugars (Tr. 236, 267-68, 275). He prescribed increased Lasix and Provera, and he recommended weight loss (Tr. 236, 275).

On August 22, 2001, plaintiff presented to the Alachua County clinic, complaining of intense low-back pain (Tr. 343). The physician noted that plaintiff's diabetes, hypertension, and aortic valve prosthesis were controlled with medication, he recommended dieting and exercise, and he continued her existing medications (Tr. 340-41). In October 2001, plaintiff reiterated her complaints of back pain and shortness of breath upon exertion (Tr. 334-35). She received Nasacort samples and was advised to exercise, control her diet, and maintain better posture (Tr. 333). On November 20, 2001, plaintiff complained of hip pain (Tr. 378). January 15, 2002 x-rays revealed sclerosis (Tr. 366).

On July 1, 2002, plaintiff returned to Dr. Dillon, with complaints of sharp, brief chest pains unrelated to activity or exertion, and shortness of breath (Tr. 235). Dr. Dillon noted that plaintiff's weight had increased since her last visit, and that her activity level had been limited (Tr. 235). A cardiac examination revealed a regular rate and rhythm, but a soft systolic murmur was noted (Tr. 235). Dr. Dillon noted plaintiff had atypical chest pain, but he opined that her pain was not cardiac related and that it was unlikely that plaintiff had an ischemic disease (Tr. 235). He reiterated

that plaintiff's "main problem [was] continued weight gain" (Tr. 235).  On July 31, 2002, plaintiff returned with complaints of chest pain (Tr. 255-57).  A transthoracic echocardiogram revealed normal right and left ventricular systolic function, mild-to-moderate concentric hypertrophy in the left ventricle, mild mitral regurgitation, mild aortic stenosis, and a mildly dilated left atrium cavity (Tr. 264-66).  Dr. Dillon commented that plaintiff's aortic valve area was artificially low, but her aortic stenosis was not severe (Tr. 266).  On August 19, 2002, plaintiff complained of back and right-knee pain (Tr. 303-04).  The treating physician noted plaintiff remained obese, recommended weight loss, and opined that plaintiff's pain was likely secondary to degenerative arthritis (Tr. 304).

On September 19, 2002, plaintiff saw gastroenterologist John R. Leibach, M.D., who noted that plaintiff continued to suffer from morbid obesity (Tr. 244). He scheduled plaintiff for an upper GI, discontinued her Glucophage, and prescribed Prilosec, Pecid, and Reglan (Tr. 244). An October 21, 2002 esophagram revealed no abnormalities, but an upper GI revealed a one centimeter polyp along the anterior wall of her stomach (Tr. 251-52, 367-68). The reading physician noted the polyp contained a tiny dot of barium, suggesting a small ulceration (Tr. 252, 368). Plaintiff was diagnosed with focal foveolar hyperplasia and mild chronic gastritis (Tr. 250). A subsequent biopsy of the polyp showed no evidence of cancer (Tr. 241).

On November 15, 2002, plaintiff returned to Dr. Dillon (Tr. 234).  She reported continued chest pain (Tr. 234).  Dr. Dillon reiterated that her pain was noncardiac (Tr. 234). Dr. Dillon concluded that plaintiff needed to control her blood sugar better, "but otherwise, she seem[ed] to be doing reasonably well" (Tr. 234).  A December 27, 2002 endoscopic ultrasonography revealed "no sign of significant pathology in the esophagus" (Tr. 369-71).

From February 2003 through March 2004, plaintiff reported several times to the Alachua clinic and the Shands hospital at the University of Florida for treatment of

her diabetes mellitus, GERD, and hypertension (Tr. 464-93).  Records from these visits were not submitted to the ALJ, but they were submitted to the Appeals Council (Tr. 5).    Although  the  Appeals  Council  "looked"  at  these  medical  records,  it concluded that the records post-dating the ALJ's August 2003 decision were outside the relevant time period (Tr. 7, 10).  These records reveal that, in March 2003, plaintiff reported "feeling fine," but in April 2003, she reported that her diabetes was "out of control" (Tr. 289, 488, 492).  On June 20, 2003, plaintiff reported falling asleep while driving and sitting, and she thought she might have sleep apnea (Tr. 491).  On September 4, 2003, plaintiff reported that she felt "bad today" with decreased energy (Tr. 482).  An October 2003 sleep study revealed that plaintiff had sleep apnea, but her sleep was improved with the use of a CPAP machine (Tr. 466-67).  On February 20, 2004, plaintiff complained of abdominal discomfort (Tr. 471).

Meanwhile, on October 24, 2002, more than two years after her alleged onset of disability, plaintiff began psychiatric treatment (Tr. 436). During her first session, the treating psychiatrist noted that plaintiff had improved with Wellbutrin (Tr. 436). On November 21, 2002, plaintiff saw psychiatrist April Kohring, D.O. (Tr. 434). Plaintiff reported feeling more depressed, and having increased sleep disturbance and  decreased  focus  (Tr.  434).  Although  Dr.  Kohring  noted  that  plaintiff  was depressed  and  mildly  anxious,  she  opined  that  her  insight  was  good  and  her judgment  was  fair  (Tr.  434).  Dr.  Kohring  prescribed  an  increased  dosage  of Wellbutrin, and she indicated that plaintiff had a global assessment of functioning (GAF) score of 70[2] (Tr. 434).

On January 2, 2003, the treating psychiatrist noted that plaintiff had a good response to the increased dosage of Wellbutrin (Tr. 433).  The psychiatrist further

---

[2] A GAF score of 61 to 70 indicates some "mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful relationships." See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) (DSM-IV-TR).

noted that plaintiff was bright, pleasant, and cooperative; that she had increased energy and no social isolation; and that her mood was "pretty good" (Tr. 433).  On January 30, 2003, the treating psychiatrist noted that plaintiff had some increase in her depressive symptoms since her last visit, and diagnosed mild recurrent depression (Tr. 432). On February 20, 2003, and February 24, 2003, plaintiff was seen by psychiatrist Martin J. Repetto, M.D., Ph.D. (Tr. 430-31).  She reported increased depression and irritability, as well as poor response to her diabetes treatment (Tr. 430-31).  Dr. Repetto prescribed Effexor (Tr. 430-31).  On March 6, 2003, plaintiff complained of crying spells, difficulty concentrating, insomnia, and occasional but not serious suicidal thoughts (Tr. 428-29).  Dr. Repetto diagnosed plaintiff with severe depression, and he increased her Effexor dosage (Tr. 429).

By letter dated March 13, 2003, Dr. Repetto indicated that plaintiff had a long history of depression, insomnia, poor energy, decreased concentration and anhedonia, and occasional suicidal ideation (Tr. 423).  He opined that plaintiff's depression was complicated by multiple medical problems, including diabetes, anemia, asthma, back pain, angina, high blood pressure, and high cholesterol (Tr. 423).  Dr. Repetto concluded that the "combination of multiple medical problems and severe mood disorder makes [it] impossible for [plaintiff] to return to work" (Tr. 423).  On March 20, 2003, plaintiff saw Dr. Kohring, complaining of worsening depression, sleep disruption despite medication, and decreased energy (Tr. 427).  Plaintiff did not have delusions, her mood was "better," and her judgment and insight were good (Tr. 427).

Additional records reveal that, on April 3, 2003, plaintiff advised that she was "feeling better," and that was feeling "bad down" only once weekly (Tr. 566).  She denied any suicidal ideation, and she reported improvement in her sleep and mood with Effexor (Tr. 566).  On May 1, 2003, plaintiff reported being "depressed" and having "poor concentration and sleep," but on May 15, 2003, she indicated that she

felt "much better" and had increased energy (Tr. 563-64). Dr. Kohring noted that plaintiff's insight and judgment were good, and that plaintiff's depressive symptoms were controlled by medication (Tr. 563). She opined that plaintiff had a GAF score of 65 (Tr. 563). On May 29, 2003, plaintiff reported having some good and some bad days (Tr. 562). The treating psychiatrist assessed plaintiff's GAF at 60 (Tr. 562).[3]

On June 5, 2003, plaintiff reported being in a "good" mood, but on June 19, 2003, the treating psychiatrist noted that plaintiff was again depressed (Tr. 560-61). On August 27, 2003, plaintiff advised Dr. Kohring that she was depressed and angry after being denied benefits (Tr. 554). On September 8, 2003, plaintiff told Dr. Kohring that she had been doing okay the last three to four days with only one "gloomy, not depressed" day (Tr. 552). On October 13, 2003, plaintiff expressed concern over her sister's recent death and the denial of her disability benefits (Tr. 548). On October 16, 2003, plaintiff advised that she was feeling okay, and her thought process was intact and her insight and judgment were good (Tr. 542). On October 30, 2003, plaintiff reported that she felt pretty good, and she denied any suicidal ideation (Tr. 543). On November 4, 2003, the treating psychiatrist assessed her GAF at 60 to 65 (Tr. 544).

On January 26, 2004, Dr. Kohring noted that plaintiff looked "less depressed," and plaintiff reported that she was thinking about working (Tr. 536). On February 16, 2004, plaintiff advised Dr. Kohring that her mood was "pretty good" (Tr. 534). On February 19, 2004, plaintiff was feeling good, and the psychiatrist assessed her GAF at 70 (Tr. 546). On March 8, 2004, plaintiff reported to Dr. Kohring with increased irritability and sadness stemming from the anniversary of her mother's death (Tr. 524). On March 18, 2004, the treating psychiatrist assessed plaintiff with a GAF of 65 to 70 (Tr. 547). On March 22, 2004, Dr. Kohring noted that plaintiff's mood was "depressed" (Tr. 529). On March 29, 2004, plaintiff reported to Dr. Kohring that she

---

[3] A GAF score of 51 to 60 represents moderate difficulty in social or occupational functioning, e.g., few friends, conflicts with peers or co-workers See DSM-IV-TR at 34.

was "feeling very depressed," but Dr. Kohring noted that plaintiff's insight and judgment were good (Tr. 528).  On April 12, 2004, plaintiff advised Dr. Kohring that she was "somewhat down" after attending the funeral of her cousin (Tr. 519).  On April 26, 2004, plaintiff reported feeling "very depressed," but on May 10, 2004, plaintiff was again "feeling fairly good" (Tr. 514, 516).  On June 21, 2004, Dr. Kohring diagnosed bipolar disorder (Tr. 510).  On June 28, 2004, plaintiff complained of increased anger and agitation, and on August 17, 2004, she reported being more depressed than usual (Tr. 504, 509).  Finally, on August 31, 2004, Dr. Kohring noted that plaintiff looked "much better," and that her mood was better (Tr. 502).

By letter dated October 5, 2004, Dr. Kohring opined that plaintiff "continues to be unable to work secondary to not only her medical illnesses but to her depression as well." (Tr. 496).  She opined that plaintiff's "psychiatric condition [was] not stable and her prognosis remain[ed] uncertain." (Tr. 496).  On October 26, 2004, Dr. Kohring completed an RFC assessment of plaintiff's physical limitations for the period from January 1, 2002 to October 2004 (Tr. 567-70).  She opined that plaintiff could sit only two to three hours at one time, and for only three to four hours total if she had five minute breaks each hour; and that plaintiff could stand for only 30 minutes at one time, and for only one hour daily if she had five minute breaks. Finally, she opined that plaintiff could work only three to four hours daily in a job with a sit/stand option, and that plaintiff could lift only one to five pounds frequently and five to nine pounds occasionally (Tr. 567-69).

On October 26, 2004, Dr. Kohring also completed an RFC assessment of plaintiff's mental limitations for the period from January 1, 2002 to October 2004 (Tr. 571-73).  She opined that plaintiff was only mildly limited in her ability to remember work-like procedures; understand, remember, and carry out short and simple instructions; perform activities within a schedule; sustain an ordinary routine without special supervision; and make simple work-related decisions (Tr. 571-72).

She further opined that plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; interact appropriately with the general public; get along with coworkers without distracting them or exhibiting behavioral extremes; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independent of others (Tr. 571-73). Finally, she opined that plaintiff was markedly limited in her ability to maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; and respond appropriately to changes in the work setting (Tr. 572-73).

Plaintiff's testimony.

At the March 2003 hearing, plaintiff testified that she cannot work because of her numerous ailments, including diabetes, depression, a right-shoulder injury, arthritis in her back and right knee, post aortic-valve replacement surgery, and GERD (Tr. 584). She testified that she has chest pains five days weekly, and that she has problems keeping food down (Tr. 585). Plaintiff further testified that her depression often causes crying spells and mood swings, and two days weekly she does not want to get out of bed (Tr. 586). She sometimes has pain in her right shoulder for three days, and she has pain in her right knee three days weekly and her back hurts daily (Tr. 587). She testified that she can walk only 40 feet before feeling shortness of breath, sit for only 40 minutes before she has low-back pain, and stand for only 45 minutes before having pain in her back and legs (Tr. 587-88). She can partially stoop, but she cannot reach overhead with her right hand or climb stairs (Tr. 588). Plaintiff testified that her diabetes causes her to fall asleep three or four times daily, and that she has trouble sleeping at night (Tr. 589-90). She further testified that Tylenol No. 3, which she takes for her back and shoulder pain, makes her very sleepy (Tr. 589).

Plaintiff testified that she lives with her sister and drives about 40 miles weekly (Tr. 580). She washes dishes and cooks, but standing while cooking hurts her back (Tr. 590). Plaintiff testified that she is blind in her right eye, but she admitted that she had worked for many years despite this impairment (Tr. 599). She testified that she could return to the type of work she had performed at the workshop, but she later equivocated, stating that, due to her mental state, she would be unable to concentrate sufficiently to do the required paperwork (Tr. 594, 596).

**Vocational expert testimony.**

The vocational expert testified that plaintiff had past relevant work as a forensic investigator (light/skilled); truck driver (medium/unskilled); personnel records clerk (sedentary/semi-skilled); and case aide (light/semi-skilled) (Tr. 597-98). The vocational expert clarified that plaintiff's job at the workshop combined the duties typical of a personnel records clerk and case aid (Tr. 598). The ALJ asked the vocational expert to assume a hypothetical individual of plaintiff's age, education, and work experience, who could work at the sedentary level, but never lift more than ten pounds or reach above chest level with her right arm (Tr. 598). The individual would also have impaired peripheral vision due to right-eye blindness, and occasional (no more than five minutes every hour) lapses of productivity (Tr. 599-600). The vocational expert testified that such an individual could perform plaintiff's past relevant work as a personnel records clerk (Tr. 601). However, the vocational expert testified that, if the hypothetical individual unpredictably fell asleep three to four times daily for ten to fifteen minutes, plaintiff's past work as a personnel records clerk would be precluded (Tr. 603).

## DISCUSSION

The plaintiff argues that the ALJ erred in finding that she is capable of doing her past relevant work, and that the Appeals Council erred in denying review in light

of new evidence, and that plaintiff was disabled from her onset date as a matter of law.   The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained.  The issue thus presented is whether the ALJ's decision that the plaintiff was not disabled, in light of her physical and mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

     1.   <u>Past Relevant Work.</u>

     Plaintiff argues that Dr. Repetto's opinion that the plaintiff could not return to work and should be "considered for disability" was improperly rejected by the ALJ, who gave it little weight because the question of whether a person can work is reserved for the Commissioner (Tr. 28).  She supports her argument by pointing to record entries that show plaintiff had real problems with her depression.  The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims.   The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner.  For instance, Title 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion.   See also Title 20 C.F.R. § 416.927(e).   Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner.  Title 20 C.F.R. § 404.1527(e)(3) and § 416.927(e)(3);   *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  Although such opinions on disability are not entitled to controlling weight, they must

not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record.  SSR 96-5p.  In *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997) the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do *any* work, and the physician subsequently wrote a letter saying the claimant was completely disabled.

To require the Commissioner to accept as controlling a statement that a patient is or is not disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters.  Moreover, a physician's opinion on whether a person is able to work may be colored by such things as the physician's knowledge of local hiring practices, whether there are specific job vacancies, a person's reluctance to do a particular kind of work, and similar matters.  These things are not properly considered by the Commissioner in determining disability.  Title 20 C.F.R. §§ 404.1566, 416.966.  For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not a conclusive medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

Here the ALJ noted that there were entries in the medical record that plaintiff's depression was controlled by medication (Tr. 433, 436), that she had a 70 GAF score and had only mild symptoms in many areas of functioning (Tr. 434), and that she was often noted to be doing well (Tr. 427, 433).  Plaintiff testified that her depression was disabling, but the ALJ did not have to accept her testimony entirely, and he did not.  "[T]he ascertainment of the existence of an actual disability depend[s] on

determining the truth and reliability of [a claimant's] complaints of subjective pain [or other subjective conditions]." *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[4]  People with objectively identical conditions can experience them in significantly different ways, and symptoms including pain or depression are more readily treated in some than in others.  "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  *Hand, supra*, at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [or other subjective complaints a claimant] allege[s] [is] not credible when considered in the light of other evidence."  *Arnold v. Heckler*, 732 F.2d 881, 884  (11th Cir. 1984).   The same analysis can be applied to a diagnosis of depression.  Thus, a physician may be told by a patient that he or she is depressed to a great degree, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.   Here there was substantial record evidence to support the ALJ's determination that plaintiff's depression was not disabling, and plaintiff is not entitled to reversal on that ground.

    2.    New Evidence.

        Plaintiff also contends that the Appeals Council erred in not accepting new evidence (described in the medical history section, above, pp. 11-12, 15-16) presented to it.  However, the Appeals Council considered the new evidence, and found that the records pre-dating the ALJ's decision were not sufficient to require

---

    [4] Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

*Case No: 1:05cv53MP/MD*

a reversal, and that the evidence post-dating the ALJ's decision were outside the relevant time period. "To review the Appeals Council's denial of review, courts will have to look at the pertinent evidence to determine if the evidence is new and material, the kind of evidence the Appeals Counsel must consider in making its decision whether to review an ALJ's decision. *See* 20 C.F.R. S 404.970(b) ("Appeals Council *shall* evaluate the entire record including the new and material evidence submitted to it if it relates to the period on or before the date of the administrative law judge hearing decision."); *Falge v. Apfel*, 150 F.3d 1320, 1324 (11th Cir. 1998). That does not mean, however, that a reviewing court can consider the new evidence in determining whether the Commissioner's decision was supported by substantial record evidence. For that purpose, the court may look only to the evidence that was before the ALJ at the time he made his decision. *Id.*

Plaintiff centers her argument on records from Dr. Kohring, one of her psychiatrists. She says that the Residual Functional Capacity evaluation Dr. Kohring filled out and the letter she wrote require reversal. However, Dr. Kohring's opinions as stated in these "new" records were no different in substance from opinions of Dr. Kohring that the ALJ had already rejected. Thus, the new evidence was either not new or was cumulative. The Appeals Council did not err in refusing to remand based on the new evidence.

Accordingly, it is respectfully RECOMMENDED that the decision of the Commissioner be AFFIRMED, that this action be DISMISSED and that the clerk be directed to close the file.

At Pensacola, Florida this 21st day of April, 2006.

/s/ *Miles Davis*
**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

*Case No: 1:05cv53MP/MD*

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).**